## IN RE GEORGE A. DAVIS, An Attorney-at-Law.

### March 16, 1904.

At the request of an attorney of this court, charges were preferred against him, charging him with professional misconduct in the territorial courts and praying for such action as might be proper under the pleadings and proofs. Issue was joined and the case was tried.

*Disbarment Proceedings.—Question of Animus of a Court:* There is no presumption of animus against the Supreme Court of the Territory of Hawaii, because it referred a question of unprofessional conduct of attorneys of such court to the Attorney-General of such Territory for investigation and such action as the facts called for; especially when the attorneys under consideration requested an investigation.

*Same.—Question of Disqualification of a Judge:* Because a judge of an appellate court would have been disqualified from sitting in a cause begun in a lower court, if it had reached his court on appeal, he is not thereby disqualified from sitting in a disbarment case in which the professional conduct of an attorney in connection with such other case, is under consideration.

*Same.—Question of Animus of a Member of the Court:* The fact

that a judge punishes an attorney several times for contempt is not by itself evidence of animus.

*Same.—Question of Disqualification of a Member of the Court:* *Quaere* whether a judge who had previously found a person to be *non compos mentis* and in need of a guardian, is disqualified from sitting in a disbarment case in which the professional conduct of an attorney in proceedings for a decree that the same person is *non compos mentis* and in need of a guardian, is under consideration.

*Same.—Instigation.—Unprofessional Conduct:* Evidence showing that an attorney, after instituting a case for his client, opposes and threatens to prevent a compromise settlement desired by his client, unless he should be paid a certain large amount of $5,000 as counsel fees, and thereafter personally conducts the negotiations for compromise, demanding and obtaining for his client an additional amount sufficient to cover his fees, does not, standing alone, tend to prove that the proceedings were originally instigated by him. Such conduct was, however, improper and unprofessional and the charge of $5,000 was an exorbitant one for the services rendered.

*Same.—Improper Agreement Between Client and Counsel.—Public Policy.—Agreement for Part of the Realizations of Litigation in Cases where there Could Be no Judgment Awarding Property:* A written agreement was made between clients and counsel to the effect that the latter should have one-third of all realizations of certain pending actions, and one-third of all property or benefits that such clients might receive from a certain relative during his life or after his death; and that such clients would not settle such litigation without the written consent of counsel. *Held,* that the agreement was objectionable, 1st, because the relation of client and attorney already existing between the parties, the attorney could not take advantage of such relation to obtain from his clients an unreasonable contract; 2nd, because of the stipulation that no settlement should be made by the clients of the matters in litigation without the written consent of counsel, which is against public policy, and 3rd, because it did not appear how any money or property could be realized by the clients as the logical result of such actions.

*Same.—Conduct of Attorneys.—Abuse of Process:* Such agreement shows an intention on the part of counsel to misuse the process of the court to compel a relative of their clients to recognize them in the division of his estate, to the end that the attorneys might receive one-third of the share coming to the clients. The fact that there was no complaint on the part of the clients does not relieve the attorneys. The court will protect litigants, especially those who, like native Hawaiians, have naturally a conciliatory nature which tends to submissiveness toward foreigners.

*Same.—Conduct of Attorneys.—Right to Sue Client.—Threats:* Counsel held his client's note for $3,000 given under an engagement for future legal services. After these services were performed, resulting in a favor-

able judgment for the client, the counsel demanded $2,500 for his services and threatened to sue the client for the full amount of the note if his demand was not paid. The client offered $1,500 and they compromised the matter on $2,000. The information charged that the respondent was guilty of gross impropriety in his conduct in this matter. *Held,* that an attorney has the right to sue his client for his fees and that respondent did not go beyond his rights in threatening to sue him under the circumstances.

*Same.—Indorsement of Integrity of Attorney:* An indorsement of respondent's business integrity by responsible citizens, is of significance and value in disbarment proceedings in which an attorney's character is attacked.

*Same.—Allowance for Attorney's Excitable Nature:* Allowance made in the consideration of the case, for respondent's impetuous nature and excitable temper, which tend, under some circumstances, to give his words and actions less significance than might be the case with a person of a different temperament.

*Same.—Object of Disbarment Proceedings:* The end to be sought in disbarment proceedings is to uphold a high standard of honor in the relations that exist between courts and those whose interests they adjudicate, and to require such a standard of those who take part, as officers of the court, in such relations.

*Same.—Expression of Such Object by Decision:* Disbarment not called for in this case, it being sufficient that the court express by a judgment not unreasonably severe, its definite policy in regard to the responsibility of its officers.


Information:    Disbarment Proceedings.

Robert W. Breckons, U. S. District Attorney, in support of the Motion.

George A. Davis, Respondent, in Person.


Dole, J.    On the 10th of August, 1903, the Supreme Court of the Territory of Hawaii, decided In Re George A. Davis, an Attorney-at-Law, "that the respondent be and he is hereby "disbarred and that his name be stricken from the roll of the "attorneys and counselors in the courts of this Territory." On the 8th of February, 1904, the District Attorney of this court filed an information in this cause charging the said George A. Davis with professional improprieties, malpractice, deceit and infidelity to his client and gross misconduct; and praying that

the said George A. Davis be cited to appear and answer and that, if the charges are sustained, he be dismissed from the roll of practitioners, suspended from practice or otherwise dealt with as under the pleadings and proofs may be proper; and the District Attorney further alleges that such charges were preferred at the request of the said George A. Davis, an attorney of this court.

The respondent in his answer, contends that said judgment of disbarment was null and void and contrary to the provisions of Section 84 of the Act to provide a Government for the Territory of Hawaii, and in his brief he further contends and shows by evidence, that the Supreme Court of the Territory requested the Attorney General of the Territory to examine the records in the Sumner case with the view of filing charges in that court against respondent, and that the Attorney General reported that while criticism might be indulged in as to respondent's methods and the amount of fee charged by him to Maria S. Davis for his services, that these were matters between attorney and client upon which no charge could be based in the absence of objection of the client, yet in the face of this report charges were, on the order of the court, preferred against this respondent. Respondent contended in his brief that his judges were his accusers.

A letter from the Chief Justice to the Attorney General of the Territory, of which the following is a copy, shows that the initiative in the matter was taken by the counsel concerned; such letter was dated March 6th, 1903:

"Sir:—

"On Friday, the 27th ult., at a hearing in the Supreme Court on a motion to advance the cause of Gulstan Ropert, trustee of John K. Sumner, vs. John K. Sumner, et al., upon the calendar, Messrs. Humphreys, Thompson & Watson, by A. S. Humphreys, Esq., counsel for certain of the defendants, with the acquiescense of Messrs. J. A. Magoon and Geo. A. Davis, counsel for John K. Sumner, requested the court to investigate the conduct of the said attorneys in the said cause. The court, for obvious

reasons, declined to make such investigation at that time but intimated that it would take the usual course in such cases by referring the matter to the Attorney General. The court accordingly respectfully requests you to investigate the conduct of counsel in the said cause and to take such further action, if any, therein as the said matter seems to you to call for."

As to the grounds upon which the Attorney General filed the information against the respondent after his favorable report to the Supreme Court, I can find nothing in the records admitted as evidence in this case.

Respondent further contended that the Chief Justice was disqualified to sit in the said case because of his admissions that he was the trustee of the bondholders of the Oahu Railway and Land Company, and also received a salary from said company, and was a stockholder therein and a son-in-law of the manager thereof, who was the owner of the majority of the stock in said corporation at the time of the filing of said order of disbarment; which facts, under Section 84 of the Organic Act, disqualify him from sitting in the said case; and introduced evidence in support thereof. The section referred to includes the following words:

"Sec. 84. That no person shall sit as a judge or juror in any case in which his relative by affinity or by consanguinity within the third degree is interested, either as a plaintiff or defendant, or in the issue of which the said judge or juror may have, either directly or through such relative, any pecuniary interest. * * *"

It is clear from the words of this section that the contention of respondent that the Chief Justice was disqualified to sit in the said cause, falls to the ground, because it does not appear that any relative of his, either by affinity or consanguinity within the third degree was interested in the said cause, either as plaintiff or defendant, or that he had any pecuniary interest in the issue thereof, either directly or through any such relative.

Respondent further attacks the validity of the order of disbarment on the ground that Associate Justice Perry, who joined

with the Chief Justice in the decision of disbarment, twice fined respondent fifty dollars and once committed him to Oahu Prison for ten days for contempt of court; and that he had rendered a decree declaring John K. Sumner *non compos mentis* and appointed a guardian over him; and he recites a copy of the record of one of such contempt cases, which was admitted as evidence in this case. The fact that a judge punishes an attorney for contempt of court several times is no evidence of enmity on the part of the judge. The grounds of the disqualification of Justice Perry because he rendered a previous judgment in another case is probably not a disqualification, although the fact that such judgment found J. K. Sumner to be *non compos mentis* and needed a guardian, raises some doubt on this question.

Although there are authorities which justify action by a district court of the United States to the extent of disbarring an attorney by virtue of an order of disbarment issued from the highest court of the State in which such district court is situated, yet under the circumstances of this case and the charges of bias and hostility on the part of one of the judges who joined in the order of disbarment, I shall base my decision solely upon the pleadings and evidence before this court, eliminating, as far as possible, all consideration of the fact of the disbarment proceedings and decision which have taken place in the Supreme Court.

The following records were offered in evidence by the District Attorney, to-wit:—the records of the Supreme Court of the Territory of Hawaii in the matter of the information against George A. Davis: the records in the First Circuit Court in John K. Sumner by his next friend Maria S. Davis vs the Oahu Railway and Land Company and Gulstan F. Ropert: and "In the "matter of the appointment of a guardian of the person and "estate of John K. Sumner, an insane person," and were admitted by the court, there being no objection by the respondent.

It was further alleged in the said information, and admitted

in the answer, that the said John K. Sumner was a man of upwards of the age of eighty-four years, with little or no knowledge of business or the value of money, and by reason of his great age and lack of knowledge was easily influenced and controlled, all of which facts were well known to respondent.

The information further refers to the judgment of disbarment of the said respondent, made in the Supreme Court hereinbefore referred to, and charges that the respondent procured himself to be retained by Maria S. Davis, and instigated and advised her to bring proceedings before the First Circuit Court of the Territory at Chambers, against her brother, one John K. Sumner, praying that the said Sumner be declared *non compos mentis* and placed under guardianship; that thereafter, on or about October 12th, 1902, the said Sumner and Maria S. Davis agreed to compromise and discontinue said action on the payment by Sumner to Maria S. Davis of $10,000, and that said Maria S. Davis, through her son, one R. W. Davis, notified said George A. Davis, her attorney, of her intention to so settle and discontinue her said action: that said George A. Davis, though claiming to act as her attorney, refused to settle and discontinue said action unless he was paid $5,000 and threatened to prevent the settlement and discontinuance of said action unless said sum of money was paid to him, and refused to take any steps to settle said action until an arrangement was made whereby he received $5,000 as counsel fees.

In connection with this charge, the court suggested an amendment to the information for the reason that evidence had appeared in regard to a written agreement for attorneys' fees between Mrs. Davis and her son on the one part, and respondent and Magoon and Peters on the other part, and such amendment was excepted to by respondent. The amendment is as follows:

"That in instituting the suits by Maria S. Davis against "John K. Sumner, one to restrain him and the Oahu Railway "and Land Company from carrying out the deal between them,

"and the other to have him declared *non compos mentis,* that
"the motive in bringing these suits was improper and unpro-
"fessional and constitutes an abuse of the process of the court."
This amendment also corrects the failure of the information to
allege the bringing of the suit against the Oahu Railway and
Land Company, in which Gulstan F. Ropert was a party de-
fendant.

I find that the allegation that respondent procured himself
to be retained by Maria S. Davis is not sustained by the evi-
dence, and that the allegation that he instigated and advised
Maria S. Davis to bring such proceedings is not sustained by
the evidence as to the instigation charged. The word "insti-
gate," is used chiefly with reference to evil actions, and although
it may be argued upon the theory of the District Attorney based
on his contention that subsequent events show the object of these
proceedings to have been to force Sumner to make a settlement
with Maria S. Davis, yet the evidence shows that Maria S.
Davis was informed that her brother, John K. Sumner, and
his trustee Gulstan F. Ropert, were contemplating the sale of
Sumner's reef property for $100,000, which money was to be
divided as follows: Sumner to retain $25,000, the Roman
Catholic Church to receive $25,000, his grand-niece Victoria
Ellis Buffandeau and his grand-nephews Williams S. Ellis and
John S. Ellis to receive the balance. On learning this, Mrs.
Davis was naturally alarmed. She had a right to feel a respon-
sibility in the matter from the fact that this information would
tend to show that John K. Sumner was under such influences
that he was in danger of losing the greater proportion of this
valuable property at the time when, as an old man, he especially
needed it for his own support. She was also justified in taking
an interest in the matter from the fact that, although she had no
present legal claim to the property, yet being his sister and
nearest relative, she would naturally come in for a considerable
share of his estate in case she should survive him. It was, there-
fore, a matter of importance to her that this estate should not

be dissipated and wasted in consequence of the influence of relations greedy for an immediate division of this property which would give them the lion's share, leaving her with neither a present share nor any prospects of a future one. With these anxieties in her mind, she requested her son, R. W. Davis, to engage an attorney for her, who spoke to respondent explaining his mother's instructions. Under these circumstances, respondent was justified, so far as the evidence throws any light on this part of the transaction, in becoming her attorney and bringing the proceedings referred to.

In regard to the charge of the information that the respondent threatened to prevent the settlement of these cases unless $5,000 was paid to him, and refused to take any steps until arrangements were made whereby he did receive $5,000, I find the only evidence on that point to be the testimony of R. W. Davis in which he said, referring to the refusal of Maria S. Davis to pay respondent $5,000 out of the $10,000 which she was expecting to receive: "All right, I will see about this or "else I will stop this deal. I have got something to do about "this;" and respondent's own testimony. It does not appear that respondent said anything further about this to his clients, but he went to see Mr. Dillingham on the subject of obtaining from the Oahu Railway and Land Company a larger price for the reef property than they had consented to give, which at that time was $105,000, and he went with Mr. Dillingham to see Gulstan F. Ropert about the matter. The evidence does not show what transpired between respondent, Dillingham and Ropert in these interviews, beyond respondent's request to them for an increase of the amount and his admission that he might have testified in the Supreme Court,—supposedly in the disbarment case, that he said to Dillingham: "Here, Magoon and "Peters have got to be paid; I think I have earned $2,500; I "think Magoon and Peters have earned $2,500, so that if you "can add $5,000 to the amount you have already agreed to in "the settlement, I will advise my client to settle." It is to be

regretted that neither the testimony of Dillingham nor Ropert was available in the case.

The evidence in regard to respondent's interview with Dillingham and Ropert introduces a new phase into the transaction. Instead of dealing further with his client in regard to his pay, he opened negotiations with Dillingham for such increase in the price of the property as would cover his claim for remuneration, leaving the $10,000 coming to his client intact. This was not carrying out his threat to his client although it may be that it was his intention, in case of the failure of this new project, to have recurred to the plan suggested by his threat to her, and to have tried to compel her to pay his claim for fees by tentatively interfering with the settlement which had been agreed to between her and Sumner. The result of respondent's negotiations with Dillingham and Ropert was that the Railroad Company paid the $5,000 asked for. While this conduct of the respondent may not fully sustain the charge at this point, it must be regarded as improper and unprofessional.

In the matter of the written agreement for compensation, made on the 30th of September, there is much conflict of testimony. R. W. Davis was not very sure about what occurred; he did not remember who drew up the agreement; he was under the impression that his mother signed the agreement in respondent's office and that he may have signed it in Magoon's office. He said he believed that the agreement was read to him by Magoon in his office. He also testified that he explained this agreement to his mother. Mr. Magoon, in his evidence, said the agreement was signed in his office and he thought Mrs. Davis signed it there, and said, following the testimony, that "this agreement represents a verbal arrangement¦ between "George A. Davis and myself;  *  *  *  Mr. Davis went into "the case first. When he called me in, I wanted to know how "we were to be paid; I was to get one-half the fee  *  *  *. "The only way I could get a fee was from Maria S. Davis and "Wallie Davis.  *  *  *  I think it was absolutely contingent

"until Sumner's death, the fee in the guardianship matter.
"* * * It was entirely contingent upon the guardianship
"proceedings. * * * It depended entirely upon what
"Maria S. Davis received when Mr. Sumner died. * * *.
"Q. Was the fee the result of the guardianship proceedings?
"A. If a guardian had been appointed it might have been, I
"don't know whether it was the result of the guardianship pro-
"ceedings or not * * *. Q. If the only fee which could
"be collected was one which had to be deferred until Mr. Sum-
"ner's death occurred, and the way I understand you it was,
"did Mr. Davis and yourself claim one-third of any sum re-
"ceived by Maria S. Davis from John K. Sumner during his
"lifetime? A. Of course I didn't know what contingencies
"might arise. · He might be put under guardianship and he
"might be released from guardianship. If he was put under
"guardianship and afterwards released from guardianship and
"Maria S. Davis got anything out of it, we would get one-
"third of that. Q. So the idea was that suit was brought by
"the sister of John K. Sumner to have him declared *non compos*
"and if he should be declared *non compos,* or these proceedings
"should be terminated or dismissed afterwards, and Maria S.
"Davis received any money from John K. Sumner, that of any-
"thing she received you were to get one-third? A. This agree-
"ment speaks for itself; if you ask me what I understood by it,
"I will tell you. Q. I will ask you whether any money could
"be obtained from Mr. John K. Sumner by Maria S. Davis in
"a legitimate manner by guardianship proceedings? A. Yes,
"I think so. Q. I want to know in what legitimate way any
"money could be obtained from John K. Sumner? A. I think
"that, if as a result of the guardianship proceedings any money
"was allowed Maria S. Davis for her attorneys, that would be
"legitimate. Q. That is one feature; if money was allowed
"by the court to pay her attorneys in securing the appointment
"of a guardian for him. A. If the court should decide to
"allow it. Q. Is there any other legitimate way? A. By

"which she should receive a benefit from the guardianship? I "don't see any other way whatever. Q. Could she by the suit "of John K. Sumner by his next friend Maria S. Davis against "the Oahu Railway and Land Company, during the lifetime "of John K. Sumner, get anything in a legitimate way from "him? A. Not if he was put under guardianship, certainly "not. Q. By virtue of this suit against the Oahu Railway and "Land Company? A. You ask me if any money could be "legitimately obtained from John K. Sumner during his life- "time by the suits brought by her against the Oahu Railway "and Land Company? Q. Yes. A. I don't see why we could "not. I don't see why by that suit John K. Sumner could not. "get money in a legitimate manner."

Mr. Magoon further said in substance in reply to respondent that the agreement was written in his office; that he must have gotten the information upon which to write this agreement from respondent; that he suggested the agreement himself; he wanted to know how he was going to be paid. He said "respondent "told me half of the fee and I wanted to have it settled this "way and so I informed you." He further said that the day after he was called into the case, or the day after that, this agreement was reduced to writing in the presence of respondent; that it was his suggestion and that it was drawn as he understood the agreement to be between Maria S. Davis, R. W. Davis and respondent; that he dictated to the stenographer and the respondent, being present, put in a word now and then.

Although Mr. Magoon in his evidence, claimed to have been retained only in the guardianship suit, yet the agreement for compensation referred to, includes also an agreement for compensation for services in the case of the *Oahu Railway & Land Company vs. John K. Sumner, et al.,* the case of John K. Sumner by his next friend *Maria S. Davis vs. The Oahu Railway & Land Company.* This agreement is as follows:

(Indorsement on Back of Agreement:—"Agreement. Maria "S. Davis, R. W. Davis, Geo. A. Davis, Magoon & Peters—As.

"to compensation in Sumner suits. No. 145. In the matter "of Geo. A. Davis, an Atty.-at-Law. Filed Feby. 10, 1904. "(Sgd.) W. B. Maling, Clerk.)

"This agreement made between Maria S. Davis, of the "first part, R. W. Davis, of the second part, George A. Davis, "of the third part, and Magoon & Peters, of the fourth part. "Witnesseth:

"That said parties of the first and second parts hereby agree "to give to said parties of the third and fourth parts one-third "of all sums of money, evidences of indebtedness, choses in "action and property recovered by them and each of them, or "to which they and each of them may be entitled or which they "and each of them may receive in the matter of the suit now "pending in the Circuit Court of the First Judicial Circuit in "the matter of (The Oahu Railway & Land Co. vs. John K.

R. W. D.
G. A. D.
M. S. D.
J. A. M.

(Sumner, et al. The case of John K. Sumner (by his next friend Maria S. Davis vs. the (Oahu Railway & Land Co., and in the mat- (ter of the petition for guardianship of John (K. Sumner, and all proceedings that may (be incidental thereto, or growing out of all (or any of said matters.

"and they also agree to give a like one-third of whatever prop- "erty or benefits they and each of them may receive from the "estate of John K. Sumner during his lifetime or after his "death by way of devise, inheritance, or in any other manner, "upon all of which said parties of the third and fourth parts "shall have a lien and first charge upon all sums of money, "claims and property received by said parties of the first and "second parts and each of them as hereinabove set forth.

"And They further agree to pay all costs of court in said "suit or matter or in any other suit or proceedings which may "be brought in the premises.

"And said parties of the third and fourth parts hereby "agree to give their professional services in said matter or mat-

"ters until final adjudication in the Supreme Court of the "Territory of Hawaii and receive as full compensation therefor "said one-third to be paid to them as aforesaid for all services "which may be rendered in the matter; said one-third to be "divided between them as follows: Said party of the third part "an equal one-half of said one-third, and said parties of the "fourth part an equal one-half of said one-third.

"AND SAID parties of the first and second parts hereby "covenant and agree that they will not settle said matter with "said John K. Sumner or with any other persons excepting "with the full and free consent of said parties of the third and "fourth parts thereto obtained in writing, nor will they submit "to the withdrawal of said proceedings that are now before the "Court or any other proceedings that may be brought in the "discretion of said parties of the third and fourth parts without "such consent in writing of the parties of the third and fourth "parts.

"IN WITNESS WHEREOF, said parties do hereunto set their "hands and seals this 30th day of September, 1902.

> "(S'g'd.)     MARIA S. DAVIS,
> "(   "   )     R. W. DAVIS,
> "(   "   )     GEO. A. DAVIS,
> "(   "   )     MAGOON & PETERS."

This agreement is objectionable on three grounds:

First:—Because the relation of client and attorney already existed between the parties, and an attorney cannot make use of the relation between him and his client to obtain from the latter an unreasonable contract for compensation.

Second:—Because the agreement contained a stipulation that no settlement should be made by Maria S. Davis and R. W. Davis, of the matters referred to, without the written consent of counsel, which stipulation is against public policy. *Davis v. Webber,* 45; *Lawyers' Reports Annotated,* 199.

Third:—The agreement was for professional services in the

guardianship case and the other cases mentioned above, already pending, and was for one-third of all moneys, evidences of indebtedness, choses in action, and property recovered by the clients or to which they might be entitled or which they might receive in relation to such actions, whether received from the estate of Sumner during his lifetime or after his death by way of devise, inheritance or in any other· manner, giving to the attorneys a lien and first charge thereon. It does not appear how any money or property could be expected by Maria S. Davis and R. W. Davis as a logical result of such actions.

Mr. Magoon's evidence in the matter is vague and unsatisfactory. He admits, in regard to the guardianship suit, that money might be allowed by the court to pay her attorneys in securing the appointment of a guardian for him, but that he did not see any other way by which the client should receive a benefit from the guardianship. In regard to the suit against the Oahu Railway and Land Company and Gulstan F. Ropert, he says, "I don't see why money could not be legitimately ob-"tained from John K. Sumner during his lifetime by such "suit." This court cannot resist the impression received by reading this agreement and hearing Mr. Magoon's evidence in connection with it, that this agreement shows an intention on the part of counsel to misuse the process of the court in these suits to force Sumner to recognize their clients in the division of his estate, to the end that the attorneys might thereby receive one-third of such share coming to their clients. If such was the object, it was inconsistent with the responsibilities and duties of attorneys to an extent which cannot be overlooked by the court.

The respondent's relation to this agreement is very uncertain. Magoon says that he was a party to it. R. W. Davis has a very indistinct recollection about it. He does not remember who drew it up; is not sure where it was signed; he thought the agreement was read to him by Magoon in his office and that he explained it to his mother. Respondent admits signing the agreement in a hurry at Magoon's request; that he did not assist

in drafting it; that he told Magoon that such agreement was void for champerty and maintenance; also that "this will prob-"ably be settled and we will get our fees." He did not attach any importance to it, did not read it at the time; deposited it at home and thought no more about it until after the disbarment proceedings. He explained that he adopted $2,500 as the amount of his fee, both for himself and for Magoon & Peters, from hearing Thompson, one of the Ellises' attorneys, say that in the settlement he and Humphreys, who represented the Ellises, were to have $2,500 and that Highton, who represented Sumner, was to receive $2,500, and this suggested to him that amount for his and Magoon & Peters' fees respectively. It is significant, however, that the amount decided upon exactly cor-responded with the proportion agreed upon in the written agreement, to-wit: one-third of the amount received by Mrs. Davis.

Although respondent denies any responsibility in the preparation of the agreement for compensation except signing his name thereto, it appears that in the proceedings for a rehearing of the disbarment before the Supreme Court, he referred to this agreement in his brief and appeared to rely upon it in attacking the testimony of R. W. Davis and J. A. Magoon, using the following language:

"The contract, submitted on the rehearing, between R. W. "Davis, Maria S. Davis, J. A. Magoon and George A. Davis, "wherein it is agreed none of the suits or proceedings were set-"tled or withdrawn without my consent in writing, exhibits the "falsity of their evidence and needs no further comment;" also in the evidence before this court, respondent objected to the introduction of testimony in regard to the settlement arranged between John K. Sumner and Maria S. Davis, both on the grounds that it was hearsay testimony and also because by the agreement no settlement of any of these proceedings or issues could be negotiated without the consent in writing of him and Magoon, adding, "Now this witness comes in and testifies to a "conversation between himself, his mother and Sumner, in

"which a settlement was arranged." Also R. W. Davis' testimony that the respondent threatened to stop the settlement unless his fees were paid, in which he was apparently acting under the theory of this agreement.

There is not sufficient evidence before the court to support the theory of the District Attorney that these proceedings were instituted with the design to force Sumner to a division of his property. There was sufficient legitimate reason for bringing these suits, as I have set forth above, but this written agreement for compensation coming in at a later date, has the appearance of a new design on the part of counsel which did not exist up to that time. This view is supported by the testimony of R. W. Davis, who said, in speaking of the engagement of respondent, "As near as I can recollect something was said about "fees,—may have been $400 or $500, I cannot exactly say," and also that respondent said on the same occasion, "I will "charge you what is reasonable and fair when we get through "these proceedings;" and by respondent's testimony, who said, "I think I asked for retaining fees at the time I met Maria "S. Davis at Mrs. King's. She said she had nothing." Some explanation of respondent's action in signing this agreement might be suggested in view of the confidence ordinarily existing between counsel employed in the same case. If respondent's account of the affair is correct, it might be that with his characteristic recklessness, he signed the document at Magoon's request and recommendation, making at the time the protest that it was void for champerty and maintenance and of no account. Under all the circumstances, however, I cannot reach the conclusion that respondent was in no way responsible for such agreement, and find that, although he may have thoughtlessly signed it, he afterwards, as set forth above, acted upon it.

The information further charges that about December 1st, 1902, the respondent made certain false representations to said R. W. Davis and John K. Sumner to the effect that he could immediately obtain for the said Sumner $48,025, at that time

deposited with Bishop & Company of Honolulu, on condition that the said Sumner would pay him for such services, $3,000, which representations were false and respondent knew them to be so and made them for the purpose of deceiving the said Sumner and obtaining from him a promissory note for $3,000 and that he did thereupon obtain such note, that the said Sumner was misled by such misrepresentations, believing the said note to be necessary to insure the immediate obtaining of said money, and that upon the failure of the respondent to obtain the sum, the said note would have no effect; that the respondent did not obtain from Bishop & Company the said money as he had represented himself able to do and refused to return the said note and kept the same.

That on or about October 29th, 1902, Gulstan F. Ropert, as trustee for said Sumner, filed a petition in the First Circuit Court of the Territory of Hawaii against the said Sumner and others, and that the respondent procured himself to be appointed as one of the attorneys for said Sumner and assisted in the conduct of said case in his behalf. That on or about the 25th day of June, 1903, the Supreme Court of the Territory of Hawaii, on appeal of the said cause, rendered a decision therein by which $48,025, then in the custody of the said circuit court, was ordered to be paid to the said Sumner; and that on or about the 26th day of June, 1903, respondent threatened the said Sumner, well knowing his weakness and inability to understand financial matters, that unless the said Sumner should pay to him $2,500 for his services in said cause of *Gulstan F. Ropert vs. John K. Sumner, et al.*, he would sue the said Sumner on the aforesaid promissory note for $3,000 and would garnishee the said $48,-025, obtained by the said Sumner under the decree in said action, and so delay the matter that the said Sumner would be unable to obtain possession of the said money, and that by reason of said threats and intimidations and preying upon the fears of said Sumner, who had great dread of litigation as respondent well knew, he did extort from the said Sumner $2,000;

and that the said actions on the part of the respondent were grossly improper and that he was thereby guilty of malpractice, deceit and infidelity to his client.

The evidence shows that respondent suggested to R. W. Davis that the said $48,025, at that time on deposit with Bishop & Company, could be immediately obtained and that R. W. Davis informed Sumner of this statement of respondent, and that Sumner thereupon authorized R. W. Davis to ask respondent to come to his house; that the respondent went there with a draft of a power of attorney and promissory note already prepared; that he repeated his assurance that such money could be promptly obtained from the bank, assuring Sumner that he could get it in twenty-four hours, adding, "If the bank refuses to pay the money, I will sue the bank;" that Sumner then asked him about his fee and respondent said he wanted $3,000 to which Sumner agreed because he had rather pay $3,000 than go to court, he had enough of going to court, and he thereupon signed the papers,—the power of attorney and the note. Under this engagement, the respondent attempted to obtain-possession of this money from Bishop & Company through a check signed by Sumner. The check was refused payment at the bank because the bank had been notified of claims on this money by an attorney for the Ellises. Respondent exhibited in court a document in his handwriting in the nature of a petition in assumpsit before the First Circuit Court against Bishop & Company for the said money. This paper is signed by respondent as plaintiff's attorney but was carried no further. Previous to this engagement, Gulstan F. Ropert, as trustee of John K. Sumner, had brought an action against the said Sumner and others, in equity, in the First Circuit Court, for leave to resign the said trust and to be released from all liability in relation thereto; that another person be appointed as trustee in his place, and that the said $48,025 be decreed to be paid to such new trustee. The court decreed, among other things, that Ropert be discharged as trustee, the termination of the trust created by the

trust deed between Sumner and Ropert, and that the said $48,-
025 be paid to Sumner as his own property.    The Supreme
Court of the Territory confirmed on appeal the decree of the
circuit court.    Respondent appeared in these proceedings for
Sumner, and assisted in the conduct thereof in both courts.
The case was vigorously contested by the Ellises.    Mr. Sumner
testified in the present case that his engagement, as he under-
stood it, with respondent was merely upon his assurance that
he could procure this money from the bank the next day, and
that the agreement went no further.    The power of attorney
which has been referred to between Sumner and respondent,
retains him as his "counsel in all suits and actions in equity
"and at law now pending in the courts of the Territory of Ha-
"waii and especially in the suit in equity now pending between
"the Bishop of Panapolis, plaintiff and John K. Sumner, de-
"fendant, the plaintiff praying to be discharged as  trustee.
"And the said George A. Davis is hereby authorized to take
"any and all steps that may be necessary to obtain possession of
"the sum of $48,025 now on deposit in Bishop's Bank."    If this
power of attorney was properly entered into between the parties,
respondent was fully justified in acting under it in the conduct
of said case of *Ropert vs. Sumner, et al.*    He did so act, and
according to the evidence, did a great deal of faithful and im-
portant work in the conduct of such proceedings, reaching, with
the assistance of his brother counsel, a decision favorable to the
defendant, as a result of which the said $48,025 was paid to
Sumner.    This power of attorney has been questioned by the
District Attorney as having been made at respondent's sugges-
tion and request, by a man whom respondent had previously
repeatedly declared on his oath to be technically insane.    Re-
spondent had deposed to that effect in his oath as counsel in
the guardianship case and in the case of Sumner by his next
friend against the Railroad Company, and Sumner had pre-
viously been declared *non compos mentis* by the First Circuit
Court of the Republic of Hawaii, which decision was vacated

by the Supreme Court by agreement of counsel. The guardian-ship case, brought by respondent on behalf of Sumner by his next friend Maria S. Davis, had been dismissed in the First Circuit Court by agreement of counsel and the case against the Railroad Company had been dismissed upon an affidavit by a considerable number of business acquaintances of the said Sumner, testifying to his sanity.

I do not find under these circumstances that respondent was acting improperly or fraudulently in entering into the agreement with Sumner set forth in the power of attorney. The evidence as to the execution of this power of attorney gives no intimation of any attempt on the part of respondent to take advantage of Sumner's recognized pliability and mental weakness. R. W. Davis was present; the document was explained to him and Sumner both by respondent and the Notary Public, who was present to take acknowledgments, and was explained by R. W. Davis to Mr. Sumner in Hawaiian. R. W. Davis testified that at this interview respondent said, "If the bank re-"fuses to pay the money, I will sue the bank." This disposes of the charge that respondent, by false representations, sought absolutely to guarantee that he could obtain the money immediately. With these reasonable precautions for the information of Sumner as to the contents and meaning of the document, and other evidence relating to the interview, I do not find that the charge of misleading Sumner by false representations in relation to his engagement of respondent in this matter is sustained, in spite of the possibility, or probability, as appears by Sumner's testimony that he may not have fully understood the power of attorney in all its details. With this finding, it follows, as a matter of course, that the respondent was acting professionally in assisting in the conduct of the case of *Ropert vs. Sumner, et al.*

As to the charge that respondent extorted from Sumner $2,000 for his fee in these proceedings, by the threat that he would sue Sumner on the promissory note for $3,000 for the

whole amount and garnishee the $48,025 obtained by Sumner by the decision in the Ropert case,—that was a matter between attorney and client, which, although perhaps open to criticism, was not, in my opinion, conduct which supports the charge of gross impropriety. Every attorney has the right to sue his client for his fees and he does not, to my mind, go beyond his rights in threatening to sue him for such fees. It is in evidence that Sumner offered him $1,500 for these services. The respondent claimed $2,500 and demanded it in a peremptory manner in the presence of his brother counsel and R. W. Davis, who was, to a certain extent, Sumner's adviser, and Sumner finally, upon consultation with R. W. Davis, proposed a compromise offering him $2,000 which respondent accepted.

In the consideration of this case, some allowance must be made for the peculiar disposition of the respondent; his impetuous nature, and excitable temper which, at times, carrying him to the verge of unreasonableness and perhaps to an almost abnormal mental condition, renders his words and actions less significant in such circumstances than would be the case with a person of a calmer and more deliberate temperament.

The fee of $5,000 obtained by respondent for himself and his fellow counsel in the earlier proceedings mentioned in this case, was to my mind, an exorbitant charge for the services rendered, one case being a simple action for the appointment of a guardian on the theory of Sumner's mental incapacity to attend to his own affairs, which case was dismissed by the circuit court by consent of counsel; and the other case being a suit to set aside a trust deed and for an injunction, which suit was dismissed before going to trial upon affidavits as stated above. This unreasonable charge for fees, taken in connection with the written agreement for such fees set forth above, implying a purpose to misuse the process of the court for obtaining them, shows misconduct on the part of the respondent that the court cannot ignore. It is true that there is no complaint against respondent by any of his clients, yet the conciliatory nature of

many Hawaiians is such, and their submissiveness toward foreigners so great, that they will, in many cases, silently yield to harsh demands, and it is the duty of the court to protect litigants even though they make no complaint, from such treatment, by attorneys of this court. These actions occurred in connection with proceedings before other courts, yet the respondent is a member of the bar of this court and this matter having been brought to the cognizance of this court at the request of respondent, its investigation and action thereon cannot be avoided.

An important feature of this case is the testimony of a number of citizens including judges of the circuit court, leading lawyers and business men, expressing unequivocally their confidence in respondent's integrity. This expression is very significant, showing an unshaken confidence in the respondent's character as to integrity in spite of the proceedings in the disbarment case. This expression may arise from a conviction that the irregularities discussed in this case, which respondent may have indulged in, were due to an erratic temperament rather than to any conscious and deliberate departure from the line of rectitude, or it may be that these witnesses are wholly uninfluenced by such case from not having followed it, or otherwise.

The end to be sought in proceedings of this character is to uphold a high standard of honor in all the relations that exist between courts and those whose interests they adjudicate, and, as a consequence thereof, to insist upon such a standard for all those who take part, as officers of the court, in this important duty.

Disbarment is not called for under the showing made in this case and it is not necessary, under the principles mentioned above, to blast the prospects of the respondent and neutralize his years of preparation by such sentence. It is sufficient that the court express by a judgment, not unreasonably severe, its definite policy in regard to the responsibility of its officers. I

feel that such an expression is attained by a sentence of suspension from practice in the District Court of the United States for the Territory of Hawaii, for a period of three months, and so order.